May it please the Court, James Siegel on behalf of the plaintiff class. I'd like to reserve five minutes of my time for rebuttal. The Constitution requires that the government provide every individual it detains with humane conditions of confinement. The government has not come close to meeting that requirement in the eight Tucson Sector Border Patrol stations. Instead, the government has packed individuals into dirty holding cells, denied them adequate medical care, and deprived them of their basic hygienic needs. Judge Burry saw the evidence of these violations, including photos of detainees crushed together in concrete holding cells, of mothers kneeling on the concrete floor, changing their babies' diapers in piles of refuse. He also heard and considered the government's excuses. He correctly recognized that this state of affairs plainly violates the Fifth Amendment. Judge Burry didn't go far enough in addressing the government's constitutional violations. As a matter of law, class members are entitled to adequate medical care, which includes medical screening and medication determinations from individuals competent to make those decisions, not from untrained Border Patrol agents. They're entitled to beds, not just floor mats. They're entitled to showers. Well, what evidence is there in the record that they're denying detainees adequate medical treatment? Because your brief recounts several incidents where prescription drugs were arguably improperly confiscated or withheld. But is there any evidence of instances where serious medical conditions went undiagnosed or where critical medical treatment was denied? So you ought to reference the denial of medications, and we would submit that that is evidence of denial of medical care itself. Okay, but what about the last thing that I asked? Is there any evidence in the record where serious medical conditions went undiagnosed or where critical medical treatment was denied? Yes, there's evidence of a declarant, for example, had a large gash in his chest that went untreated. There is evidence of a woman who was bleeding and never received treatment for that condition. But having said that, even aside from the concrete evidence of medical treatment denied, the question is whether there's a risk presented to the detainees as a matter of law under the Eighth Amendment, so certainly under the Fifth Amendment due process clause, that exposing detainees to intolerable level of risk itself violates the Constitution. Counsel, one of the problems I have with this case is the unique nature of Border Patrol detention facilities and the fact that we have police departments and sheriff's offices all over the circuit that have holding areas where they process people before they take them to the local county jail or whatever the local detention facility is. Is it your position that even a holding cell in a police station that's used for processing somebody on a DUI arrest before they're taken to the county jail has to have a nurse on duty to screen the person, beds, showers, that sort of thing? If they hold people for as long as the Border Patrol agents are holding detainees in these facilities, yes, it is. So what's your cutoff period? Because clearly if it were four hours or less, would your answer be the same? So it depends on the particular deprivation that we're talking about. Medical care is required for any length of time in custody. This Court in Gibson recognized that, as well as Lawley. Both of those were individuals who were detained in local jails just for a few hours. I thought there was testimony in the record that if the condition is obvious, for example, somebody has broken a leg out in the field when they're first taken into custody, that they actually do summon an ambulance or transport the person to a hospital. So the Border Patrol agents have basic first aid training that would likely be adequate to take care of something really obvious. So it's not like they're doing nothing. Your concern is that they need to be doing more. There are a number of other medical conditions that present an issue. The spread of communicable diseases is the most obvious issue, and that's why courts have generally held that screening is necessary at intake. But that's the question I'm wrestling with, is what constitutes intake? Because these are not designed to be even short-term stay facilities. These are police stations, essentially. The difference, though, I guess, from sort of your local police department, is that they're processing a huge volume, potentially as many as 100 or 200 people a day, and it takes a long time to process that many people. They're processing a number of people. That doesn't necessarily distinguish them from local jails. The Maricopa County Jail just miles down the road. I'm not talking county jails. I'm talking police stations that are not 24-hour jails. I'm really concerned about the precedent that you're asking us to set here. I'm trying to figure out what the limits are of the rule that you're asking us to adopt. I'm not asking Your Honor to set any precedent. I believe the precedent was already set in Gibson, where Gibson held that medical screening is necessary immediately upon intake. And intake means when the detainee is introduced into the population. Excuse me, counsel, because I think this is important. When you say medical screening, are they supposed to have a licensed medical doctor who stands there and everybody that comes in, they give them a physical? Is that what you mean by medical screening? Couldn't a Border Patrol agent do a medical screening? A Border Patrol agent could do medical screening if they had adequate training and if they were overseen by a medical professional. A medical professional includes either a doctor or a registered nurse. And the medical professional doesn't need to necessarily physically be there. So I understand that. That would require a lot of resources. It could take a lot of time. But what does need to happen, what does happen in thousands of booking stations and jails across the country, prisons, is that there are specially trained corrections officers who understand how to, for example, take necessary observations regarding communicable diseases, take a medical history to report their findings, that they are trained in order to conduct these screenings and that they are able to communicate with a medical professional. Well, maybe I'm not making my questions very clear, but I'm drawing a distinction between those law enforcement facilities that are essentially the front line stations in the war on crime that are bringing people into the facility for a very brief period of time and then they take them to what I'll call an overnight or long-term stay facility. That's the concern I have. So the government assumes obligations to everyone it takes into its custody, and that includes adequate medical care. And so there's no exception to that obligation if the purpose of the detention is just supposed to be for a few short hours. If a medical issue arises during that period of time, the government's obligated to provide care. But does that obligation entail what Judge Ezra asked you about? Do we have to have a doctor or a registered nurse at every 10-person police department in small towns? Every 10-person police department has to have correctional officers who are trained to take a medical history and make necessary observations. And those particular corrections officers need to have access to a medical professional. Even if all they're going to do is roll their fingerprints and take their picture and prepare an arrest report before they lodge them at the county jail for a longer time? Yes, because emergency medical issues can arise in a matter of hours. Well, honestly, if someone passes out and they're on the ground, they have to do something. But you're talking about you just want a full workup. Not a full workup, just a sufficient screening to ensure that the introduction of this person into the population isn't going to expose the entire detainee population to communicable diseases. There's a number of issues presented with measles, other tuberculosis. Correctional officers need to be trained in order to observe the signs of those diseases. You seem to be talking past the issue that I'm trying to get you to focus on, and that is that there is a distinction between a booking holding area and lodging somebody into a longer-term facility like a county jail or a metropolitan correctional center. Do you understand the question? I understand the question perfectly well, but I also think, Your Honor, so a county jail often holds people for the same amount of time that the detainees are held here in these border patrol stations. So without answering the question, you understand the distinction, but you just say they're the same. No, Your Honor. The obligation is the same. The government, even these local booking stations where people are held for a very short period of time, the government is obligated to provide medical screening. That's what this Court's held in Gibson. The individual in Gibson received. Well, medical screening may include taking immediate action if the person collapses on the floor or is bleeding or stops breathing, but is your position that if the highway patrol arrests somebody for DUI and takes them to a local area office to complete the arrest reports before they take them to the county jail, they have to have a doctor or a nurse on duty at the area office? Again, no. They just need to have a medical screening performed by someone competent to make who is trained and competent to do it. Could that be the officer? It could be the officer, but they just have to have specific training. Here the officers don't have that sort of training. All they have is basic first aid training, and that's not sufficient. Although the record suggested there were some EMTs and some paramedics. There are 265 EMTs out of 4,000 total border patrol agents. Those EMTs aren't the ones who are screening each individual detainee. And if I may just turn to the beds issue. Go ahead. So medical care is necessary for any length of time. Beds, if a detainee is just in a holding facility for an hour, they don't have a constitutional right to a bed. But this Court has held, following a number of other circuits in reaching this holding, that any time the government takes an individual into custody overnight, then they must provide a bed. Here, 50% of the detainees are held for more than 24 hours. 10% are held for two days. Another 2%, which sounds small, but we're talking about such a large number of detainees, it's hundreds and hundreds of detainees held for more than three days. The government doesn't provide them. So the district court ordered mats and Mylar blankets to be afforded to anybody held longer than 12 hours. And your position is, no, it has to be a fixed bed with a mattress? The most important point is that the bed has to be above the ground. And so the core jail standards provide it has to be 12 inches above the ground. The reason for that, it's basically a matter of both human dignity and hygiene. So when detainees are crushed together on the floor where everyone walks, where everyone else is breathing together, it's very unsanitary. It's also just, I mean, Your Honor has likely seen the pictures of the detainees crushed together against the toilet stalls. It's not sanitary. It's not dignified. What are the current conditions in the border patrol stations? I mean, we all hear on the news that less people are crossing the border. The numbers have come down, I think, significantly. Detainees still are sleeping on the floors. The actual processing times, my understanding is, have not changed significantly. So the same percentage of detainees. I thought the government is now urging the court that the processing times have increased as a result of the injunction. So that was, they submitted a declaration suggesting there were some capacity concerns. And one of their. Increased delay in processing. So that was a year ago. And they said that due to some capacity concerns, they had been unable to transport detainees from one station to the other station that they wanted to use as a transportation hub. That's the Tucson sector. That's the Tucson, the main Tucson sector station. Just to correctly realize that there was not an excuse for the unconstitutional conditions at issue here. I mean, this was a problem that, I mean, in the first place, the capacity concerns are not themselves cognizable justifications for constitutional violations. But in any event, it was something that could be addressed simply by having more van drivers. It was not a justification. Turning finally to the shower issue. This is, again, a matter of basic hygiene. The detainees here have traveled often through the desert. Again, they might have a number of communicable diseases. They might have lice. People in jails, anytime they're held for 24 hours, are generally given a shower. Detainees here are not afforded that at all. At the moment, the government just provides them with adult body wipes. It's a foot by a foot. It's small. They're not given the privacy in which to use that. They can't clean themselves properly. That presents an intolerable risk to the detainee population. Again, the spread of diseases. It's also just it's not humane. It's not how we treat people in this country. Do you want to save some time? I would. Okay. Let's hear from the government. May it please the Court, Christina Periscindola for the defendants. I would like to reserve five minutes for rebuttal. I have a question. Just your claim seems to be that the district court didn't properly apply Belle v. Wolfish. But that seems to overlook the fact that the court cited Belle several times. So it wasn't that the court wasn't aware of Belle. It just didn't apply it the way. You know, I guess what I'm just trying to understand, I understand why you are defending the position that you prevailed on. And this is a preliminary injunction. Is your appeal on the other more prophylactic? Or are you really screaming at the top of your lungs that the mats and the wipes are, you know, really didn't, weren't a sort of a recognition of Belle and accommodation to this particular situation? I mean, the court didn't order beds. The court didn't order showers. Your Honor, if I understand your question correctly, I think it's the former rather than the latter. The government seeks remand of this case for the district court to apply the individualized evaluation under the Supreme Court's two-part test in Belle v. Wolfish. And while the district court cited to it. Was aware of it. Was aware of it. Absolutely. Just didn't come to the same conclusion that you wanted the district court to come to. The district court did cite to Belle v. Wolfish, but did not apply that analysis to each one of the conditions that the plaintiffs are complaining of. But the district court went and visited some of the facilities, did it not? Your Honor, I don't know, but I think I saw something in the transcript. The court said that it had. And the order, I think, does address some of the practical problems that I was exploring with opposing counsel with regard to sort of the unique pressures on these border patrol stations. So I'm not quite sure, other than reweighing the facts and coming out with a different result, what is it that you think the district court needs to do on remand if we send it back? So, Your Honor, if I could address the first part. The district court did acknowledge some of the conditions and the unique operational challenges. There's one that plaintiffs pointed out. There was a fixed meal time of 4 a.m. And the district court found that there was no operational justification for that. And that was a part of the preliminary injunction. And, you know, the border patrol has complied. And I am not aware of any operational need for that requirement. So in some respects, the district court did look fully at the operational needs. In others, it did not. And ---- It did not, or in your view, it did, but didn't come to your approved conclusion? No, Your Honor. The district court basically superimposed rulings from other judicial opinions dealing with other types of confinement environments, like civil confinement under the California Sexual and Violent Predators Act or confinement, I think, of mentally disabled individuals. Let me ask you this. The district court requires blankets and these wipes that you're talking about. You think they're unnecessary? No, Your Honor. We are not challenging that part of the remedy. So what exactly are you challenging? To get back to Judge Callahan's question, what is it specifically, specifically now, that you think the district court ordered your client to do that your client should not have to do? Your Honor, I think we have to separate the court's analysis and the application of the law from the remedy. And we're challenging both of those. Let's just get to the remedy. What is it that exactly you think the district court did that shouldn't have been done? The order to provide sleeping mats after 12 hours to each and every detainee, regardless of the circumstances. It is too rigid for the Tucson sector. Would you accept 24 hours? I'm trying to figure out where the line should be drawn. Yes, well, 24 hours would be very, very helpful. And the Border Patrol could comply with that, although they are complying with the 12-hour requirement right now. But, I mean, he did on motion for clarification say, look, the clock starts running as soon as they arrive at the police station, right? Yes. And before that, the Border Patrol was counting the time from, I guess, when they apprehended them in the field, which could be several hours earlier by the time they get to the Border Patrol station. Yes, and that was a record-keeping issue, and the district court clarified that for us. And you track, do you not, hour by hour, how much time each detainee has been at the station? Yes. And then when the clock says they've been here 12 hours, you give them a mat and a Mylar blanket? Your Honor, the way it is working now, because the numbers of people migrating across the border have dropped substantially, and by that I mean on a monthly basis. In fiscal year 2017, it's probably one-quarter to one-half each month of what it was last year. So you can actually do it now, but you couldn't do it before. Exactly. And we're supposed to go back to the way that it was before. Well, Your Honor, the issue is, though, so when we had asked for reconsideration of the preliminary injunction, at that time, the 12-hour mat requirement was causing significant operational issues, and that's in our brief. Right now, it is not. However, we don't know what will happen next month. We don't know what will happen next year. And already the numbers are increasing just this past month. Okay, but we're not supposed to tell prisons or detention centers how to run them. We're supposed to defer on some level. But that deference isn't unlimited. Yes. So it sounds a little bit like what you're saying here is you're doing what you can do, what you were asked to do at this point. You just couldn't do it before. That's correct, but we also... We don't want anyone to tell you anything that you have to do. I don't think that's the case, but... So are you asking for surge protection? Is that what you want us to do? A safety valve. Okay, call it a safety valve. Yes. I call it surge protection. All of a sudden, you've got 250 people knocking on the Sally Port door. Actually, yeah, I think your analogy is better. That is exactly what we seek. But wouldn't you go to the district? I mean, this is a continuing injunction, right? Yes. All right. So you would always have the opportunity to go back to the district court, wouldn't you? Yes. All right. Isn't that your surge protection? Well, we did go back to the district court after the preliminary injunction was issued. And in January, the court said they're still... But your numbers are down. They are now. And you're able to comply. So there is no surge. So I can certainly understand that. But if the tidal wave were to break across Tucson, as you are concerned about, you could always go back to the district court and say, you know, we can't comply because we now have these huge numbers, and we need some modification. You could do that, couldn't you? We could, Your Honor. But when we did move for reconsideration in November, when the numbers still were high, the court, the district court still insisted on the 12-hour time limit. And also, I just wanted to add, right now, the detainees at most of the stations actually get the mat when they arrive. So the numbers are so low that the Border Patrol in Tucson has the ability to do that. So they're going beyond compliance. You understand you're in a kind of a difficult position here because your numbers are way down right now? I'm sorry. Is our position? Your numbers are way down right now. They are. And generally speaking, Federal courts don't speculate. And what you want is us to speculate that something is going to happen in the future? Your Honor, no, we're not asking the court to speculate. We're asking the court to remand. Not tell you what to do. To not tell us. Don't tell a detention facility exactly what to do and how to comply. Let me ask you this. Is the agency also trying to address the problem on a long-term basis? Have you gone to GSA or whoever it is who builds your facilities to say, look, we need to expand capacity at these border stations? Yes, Your Honor. There are plans for expansion of capacity. And if that does happen, there are plans in the works. And, you know, with some notice, the Tucson sector can get up and running and have capacity for a lot more people. So have they gone to some of the other counties to see if maybe they can rent bed space from other county jails besides Santa Cruz County? At this point, I'm not aware, but I know right now everybody, after they're transported to the Tucson Coordinating Center, if they're there overnight, they go to the Santa Cruz County jail. So that is right now what's going on, and everybody's getting a bed and a shower if they have to go to court the next day. So I assume you agree with the judge that they should not have beds per se? I think it would be operationally infeasible at some of the stations. I'm not asking you that. I'm asking you whether you agree with the judge. The judge said that it wasn't necessary. You won on that issue. Yes, I know. Thank you. No, of course. Don't snatch defeat from the jaws of victory here. Thank you. No, thank you for the softball. Did you want to save some time? Yes. Okay. I mean, it's a little unusual, but with cross appeals, we can give you some time. I did save time. I can address some of the points that plaintiff's counsel raised, and I just they're all in the brief, except I do have to address one issue of the stills from the surveillance video that they have put in their brief. These are snapshots from surveillance video. They don't have any context. We don't know when they were taken or if there's a woman changing her baby. Was there no testimony at the hearing on the preliminary injunction? There was testimony, but it doesn't provide any clarification of how long the person was there in that situation, how long the people were sleeping on the floor. But you're not denying that there may have been times in the past when the conditions looked like that? They may have looked like that. We don't know for how long. There could have been an influx of people, and the Border Patrol just had to put them in a room and have them wait, but we don't know for how long. You had one month, I forget what year, I think it was in March of 2015 maybe, where you had 32,000 apprehensions in the month, right? Right. So I forgot to look at what date the video stills were taken, but I'm assuming it was in what I will call a surge month. So why did the district court err in relying on that evidence if the concern is what happens when we have surges? Your Honor, the district court in the preliminary injunction actually, I don't think, relied on the photo stills. So I just – Well, wait a second. I thought you said that they were introduced at the evidentiary hearing. They were. The court has seen that evidence. I'm sorry. The court did not articulate any factual findings based on those photo stills. Okay. Do you want to save some time? Yes, I do. All right. Thank you. Well, counsel, I mean, as I understand it, the manpower assigned to the Tucson sector has changed significantly since the litigation started, has it not? In other words, Congress allocated more funding for increasing the number of personnel assigned. I believe that's true, and I think that would certainly not take the favor of granting the – But that doesn't mean that the resources are unlimited. I mean, the problem is that we've got a spatial limitation, do we not? These holding cells are steel and concrete, and what needs to happen is a major renovation or reconstruction project. Well, it's hard to recognize there are actually a number of ways the government could satisfy its constitutional obligations short of expanding these particular facilities. They could lease other facilities. Is there anything in the record that tells us how much additional capacity is available? Because I'm pretty certain the Santa Cruz County Jail probably holds some other people that are there besides – There are also ICE detention facilities. There are a number of other facilities nearby. Also, the most – So are you representing that the record shows there's plenty of additional overflow space? Because that seems counter to what I thought I read in the record. There is additional overflow space. The government said that – One of the separations the government claimed that they were unable – There were certain capacity constraints at a certain time at the Santa Cruz County Jail, and at the ICE facility. Although it also said that coordination with ICE was on the loose. Okay. That's an interagency cooperation issue. Well, I don't know how realistic that is, given all the things that they have to do. I mean, part of the problem here, as I see it, is until we finish processing these people, we don't know who they are. They could be a very innocent family of four trying to seek a better life, or they could be somebody who was recently deported after serving a long prison sentence in a state or federal prison, who was deported to Mexico, and now he's back again, and now he's committed a new felony. But we don't know that until after all the biometric check is done. That's really true. I actually testified at the preliminary interruption hearing that the processing itself generally can take just two to three hours. It's the number of other steps, including interagency coordination, that tend to take longer. Well, you've got to make consultations available if people request that. Asylum interviews. I mean, there are a lot of things that are done that are unique to a Border Patrol facility that a county jail doesn't normally do when an alien is booked into the county jail for a DUI arrest. That may be true, but these facilities were originally designed for processing to take just a few hours. But that was the understanding. But not with the idea that they would be processing 32,000 in a month. Actually, no. At the time these were designed, they were processing far more people. So I think the testimony at the preliminary interruption hearing was that in 2005, there were 250,000 people being apprehended in the Tucson-Sacramento area. Now we're far below that. We're down to like 16,000 or 17,000 or something. I think it was 65,000 at the time of the hearing, and it's gone since then. Okay. Thank you. Just briefly, I wanted to mention that, you know, what I think we're missing here is what makes the Border Patrol unique is the constellation of factors. And I think as plaintiffs are pointing out that, you know, there are jails in remote areas, and, you know, we're saying the Border Patrol stations are in remote areas. But it's the constellation of all of these factors. You're bringing in people at all hours of the day, mostly at night. You have a very diverse population. Judge Tallman, as you alluded, some are eligible for asylum. Some are people with a criminal history. We have to separate detainees. Sometimes there will be empty hold rooms, and that's for a reason, to segregate families with children from the male population. Counsel, I mean, all of my questions came from the record, and that was what was in front of Judge Burry when he ruled. So do you just disagree with the way that he factored in those facts in fashioning the relief that he fashioned? Is that what... No, Your Honor. We specifically want the district court to apply Bell v. Wolfish. So that means... Where did you want the district court to apply it? Which... You know, it didn't articulate that analysis with regard to all of the confinement conditions. Instead, it borrowed from other opinions. He wrote a long opinion where he talks about all that. Didn't he? No, he basically said, well, we need sleeping mats after 12 hours because people have been traveling through the desert. But that's it. He didn't take into account the need to transport people from remote stations to the Tucson Coordinating Center. Did he hear evidence of that? It's all in the record, and what are you saying that he just closed his ears off when that was going on and didn't consider it in his decision? He didn't articulate the consideration... In the way that you want him to weigh it. He didn't weigh it at all. That was... That's why we're here. Well, you don't... How do you know that? Just because he didn't write it down, you assume he didn't think about it or didn't weigh it? That's... Basically. Well, but... If every district judge in every case... And Judge Callin was a district judge. Judge Talmadge sat many years as a district judge. I sat in Tucson on and off for 20 years. If they wrote down everything they considered, the Federal court system would come to a complete halt and every case would have a 500-page opinion. I mean, I don't see that he didn't consider these issues. I think Judge Callin has hit the nail on the head. Your Honor, I guess... As I read the preliminary injunction, he didn't consider many of these factors. I guess what baffles me is he wrote a 29-page opinion in which all those facts are included. And I'm at a loss to understand why you think he ignored them. I mean, it really sounds to me like you just don't like the conclusion that he reached after looking at it. Is your position that there was clear error here in the district court's factual findings? No. We're not arguing that. We would prefer an articulation of the facts that he relied on. For example, he said, well, after 12 hours, people need a sleeping mat, and pulled that from the American Correctional Association standards, which are not part of the Constitution, and there are a lot of issues with those standards. But, Your Honor, talk about that. That's line drawing. You'd prefer that he drew the line at 24. He drew it at 12. Is 18 the compromise here? It's the rigidity of the time limit at a specific time. But you've got to draw a line somewhere, do you not? I was trying to get Mr. Siegel to admit that four hours would be okay. I'm not sure I got that concession out of him. And you want it at 24, and you're saying 12 is unreasonable. What do we do with that? Well, Your Honor, we could do it, for example, when processing is complete and the detainee is waiting for a chance to work. But processing can take up to three days, according to the record, for some of these folks, a small number. But nonetheless. Well, actually, I don't think that time period is overstated because of record-keeping issues. And for many of those detainees, it's because they spent time in the hospital or there is some unusual circumstance. But I do want to underscore this is really a case of first impression for the Border Patrol. So what happens here will be guidance for, I think, the rest of the sectors. So that's why we're taking this seriously, and we would like a remand so that the district court fully applies Bell v. Wolfish. Okay. Thank you very much. Very difficult case. Case disargued is submitted. We'll get you an answer as soon as we can.
judges: Tallman, Callahan, Ezra